IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Case No. 5:14-cr-00058 |
| v. | ) By: Michael F. Urbanski |
| | ) United States District Judge |
| RICHARD SHELTON FOWLER, et al., | ) |
| Defendants | ) |

## MEMORANDUM OPINION

Before the court are renewed motions for judgment of acquittal filed pursuant to Rule 29 of the Federal Rules of Criminal Procedure by defendants Richard Shelton Fowler (ECF No. 215) and Steven Maurice Pemberton (ECF No. 217). On July 21, 2015, Pemberton, Fowler, and three other defendants—Leondra Sykes, Alexander Ayanou, and David Yarborough—were charged in a six-count superseding indictment arising from the alleged use of stolen credit card numbers to make fraudulent purchases of household goods. Specifically, the superseding indictment charged Pemberton with conspiracy to engage in credit card fraud in violation of 18 U.S.C. §§ 1029(a)(2), (a)(5), and (b)(2) (Count 1), attempted credit card fraud in violation of 18 U.S.C. §§ 1029(a)(5), (b)(1), (c)(1)(A)(ii), and 2 (Count 3), and two counts of aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4), and 2 (Counts 4 and 5).[1] Fowler was charged with conspiracy (Count 1), a separate count of attempted credit card fraud (Count 2), and three counts of aggravated identity theft (Counts 4, 5, and 6).[2]

Pemberton, Fowler, and Ayanou proceeded to trial on August 3, 2015. At the close of the government's evidence, defendants moved for a judgment of acquittal on all charges. ECF No. 187.

---

[1] There are three indictments filed in this case. See ECF Nos. 3, 136, 258. The first superseding indictment, ECF No. 136, was controlling at the time of trial, and all references to the "superseding indictment" refer to this document.

[2] Count 6 was later dismissed on the government's motion. ECF No. 207.

The court granted the defendants' motions to dismiss Counts 2 and 3, but reserved decision on Counts 1, 4, and 5. ECF No. 190. The defendants renewed their Rule 29 motions at the close of trial. Id. The court continued to reserve decision, and submitted the three remaining counts to the jury. Id. The jury returned a verdict finding Fowler guilty on Counts 1, 4, and 5 but could not reach a verdict as to Pemberton on any count. Ayanou was acquitted on all counts. After the jury returned its verdict, counsel for Fowler requested a poll of the individual jurors pursuant to Federal Rule of Criminal Procedure 31(d). The poll revealed a lack of unanimity as to the jury's verdict, and the court declared a mistrial as to Pemberton and Fowler. ECF No. 208.[3] Pemberton and Fowler then submitted written briefs in support of their motions for acquittal on Counts 1, 4, and 5, and the court heard oral argument on October 22, 2015. For the reasons set forth below, both motions are **DENIED**.

## I.

Rule 29 of the Federal Rules of Criminal Procedure states that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Rule further provides that a court can reserve decision on a motion for acquittal until after the jury returns a verdict or is otherwise discharged. Fed. R. Crim. P. 29(b). When, as here, the court reserves decision on a Rule 29 motion made at the close of the government's case, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

"A judgment of acquittal based on the insufficiency of evidence is a ruling by the court that as a matter of law the government's evidence is insufficient 'to establish factual guilt' on the charges in the indictment." United States v. Alvarez, 351 F.3d 126, 129 (4th Cir. 2003) (quoting Smalis v.

---

[3] The court granted Alexander Ayanou's oral motion for a judgment of acquittal. ECF No. 206.

2

Pennsylvania, 476 U.S. 140, 144 (1986)). "The test for deciding a motion for a judgment of acquittal is whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." United States v. MacCloskey, 682 F.2d 468, 473 (4th Cir. 1982). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996). Accordingly, a court must deny a defendant's motion if the evidence presented at trial, viewed in the light most favorable to the government, is sufficient for a rational juror to find each element of the offense beyond a reasonable doubt. United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1402 (4th Cir. 1993) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also United States v. Friske, 640 F.3d 1288, 1290–91 (11th Cir. 2011) ("In reviewing a sufficiency of the evidence challenge, we consider the evidence in the light most favorable to the [g]overnment, drawing all reasonable inferences and credibility choices in the [g]overnment's favor.").[4]

## II.

Defendants first argue that there is insufficient evidence to support a conviction on Count 1, which charges conspiracy to engage in credit card fraud. Defendants claim that there is no evidence showing that they knew of the conspiracy described in Count 1, much less that they knowingly and voluntarily joined any unlawful agreement. Defendants also challenge the credibility of key government witnesses, and urge the court to ignore their testimony.

---

[4] That the prior trial resulted in a mistrial and not a guilty verdict does not affect the Rule 29 standard. United States v. Jaensch, 678 F. Supp. 2d 421, 427 (E.D. Va. 2010), aff'd, 665 F.3d 83 (4th Cir. 2011) ("Nor is there any support for the proposition that the Rule 29 standard applicable to a surviving count following a mistrial is different from the standard applicable at any other time a Rule 29 motion may properly be brought."). The court's analysis turns, as always, on whether the evidence is sufficient for a reasonable juror to find the defendants guilty beyond a reasonable doubt.

3

Defendants raise similar arguments for Counts 4 and 5. For these counts, the government alleges that defendants aided and abetted commission of aggravated identity theft, and are otherwise liable as co-conspirators under Pinkerton v. United States, 328 U.S. 640 (1946). As to aiding and abetting liability, defendants claim there is no evidence they knowingly aided or abetted another's commission of aggravated identity theft or intended for that crime to take place. Likewise, defendants claim Pinkerton liability is inapplicable because the government failed to show that they were members of a conspiracy to commit credit card fraud or that the commission of aggravated identity theft was reasonably foreseeable to them. The court will address each argument in turn.

### A. Count 1

Count 1 alleges a conspiracy in which individuals used stolen credit card numbers to purchase household goods from various home improvement stores. One defendant—David Yarborough—illegally obtained a series of credit card numbers from victims in and around Washington, D.C., which he then sold to Renodo Taylor. Taylor used the stolen numbers to purchase merchandise online or via phone from stores in Pennsylvania, Maryland, Virginia, North Carolina, and West Virginia.[5] Taylor allegedly contracted with various individuals—including Pemberton and Fowler—to deliver this merchandise to the buyers Taylor identified. Occasionally, goods would be stored at Eagle Haulers, a Maryland storage facility owned by Fowler, before being delivered to one of Taylor's customers.

To meet its burden on Count 1, the government must prove: (1) that an agreement existed between two or more criminally culpable persons to commit credit card fraud; (2) that the defendants knew of the unlawful agreement; (3) that the defendants knowingly and voluntarily became a part of the unlawful agreement; (4) that at least one overt act was taken in furtherance of the unlawful agreement; and (5) that the unlawful agreement affected interstate commerce. As with

---

[5] Taylor pled guilty to multiple charges in a related case, including conspiracy and several counts of aggravated identity theft.

any conspiracy, the government need not offer direct evidence of an agreement to commit credit card fraud. "By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement." United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996). "Hence, a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced." Id. "Circumstantial evidence tending to prove a conspiracy may consist of a defendant's 'relationship with other members of the conspiracy, the length of this association, the defendant's attitude and conduct, and the nature of the conspiracy.'" United States v. Yearwood, 518 F.3d 220, 226 (4th Cir. 2008) (citing Burgos, 94 F.3d at 858). Moreover, "a member of a conspiracy may not know its full scope or partake in its full range of activities." United States v. Leonard, 777 F. Supp. 2d 1025, 1033 (W.D. Va. 2011). Thus, "the evidence need only establish a slight connection between a defendant and the conspiracy to support conviction." United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010).

### 1. Evidence of Fowler's Role in the Conspiracy

Fowler focuses on the second and third elements of conspiracy, arguing that there is no evidence he knew about the stolen credit card numbers, nor that he knowingly and voluntarily became a part of a conspiracy to commit credit card fraud. The government counters that multiple witnesses testified to Fowler's role in the conspiracy, including one witness who testified that Fowler knew about the stolen card numbers. The government also points to circumstantial evidence of Fowler's knowledge, including his attempts to avoid detection by police, the unusually high prices he charged to transport and store Taylor's goods, and discrepancies in multiple invoices recovered from Eagle Haulers. The government argues that this evidence, when viewed in the light most favorable to the prosecution, is sufficient for a reasonable juror to convict Fowler on Count 1. The court agrees.

5

The government's key witness against Fowler was Renodo Taylor, the alleged leader of the conspiracy. Taylor testified that he arranged for Fowler and Eagle Haulers to store merchandise he purchased with the stolen credit card numbers. Trial Tr., Aug. 5, 2015, ECF No. 233, at 19:17–21:10. These items included generators, hardwood floors, appliances, lawnmowers, and other household goods. Id. at 21:8–10. In some cases, Fowler would personally pick up and transport the goods to Eagle Haulers. Id. at 20:23–25. Other times, Fowler would accept delivery from third-party drivers, either paying the drivers with money provided by Taylor or paying them with his own funds and later seeking reimbursement from Taylor. Id. at 22:14–17. These deliveries were made at a parking lot located a few blocks from Eagle Haulers or directly at the Eagle Haulers warehouse. Id. at 22:1–25. Taylor would usually initiate the pick-ups himself, but Fowler would also contact Taylor directly to arrange deliveries when Fowler was returning to Eagle Haulers from other work. Id. at 33:5–13.

Taylor testified that Fowler would either store the items at Eagle Haulers until Taylor could find a buyer, or sell the items himself and pay Taylor a percentage of the sales price. Id. at 21:3–21:25. Fowler charged approximately $500.00 to store the merchandise for a few days. Id. at 21:3–16. If Fowler made the pickup himself, he charged approximately $1,000.00. Id. at 22:24–23:7. Taylor testified that, over time, Fowler demanded more money because of "the risk" involved. Id. at 61:9–62:1.

Other witnesses confirm that Fowler played an active role in storing merchandise Taylor purchased with the stolen credit card numbers. For example, Leondra Sykes testified that he was hired by Taylor—who he knew only as the "broker"—to pick up and deliver goods to various locations, including Eagle Haulers. Trial Tr., Aug. 5, 2015, ECF No. 234, at 7:6–11:1. Sykes testified that Fowler was present when he delivered goods to Eagle Haulers. Id. at 10:21–12:10. He also stated that he provided Fowler with the invoice for the merchandise, and would receive a cash

6

payment from Fowler for his work. Id. at 11:14–21. On at least one occasion, Fowler gave Sykes a written receipt for his $1,000.00 delivery fee. Id. at 17:10–16.

A third witness, Special Agent Chad Laub of the United States Secret Service, provided details about similar invoices and receipts he discovered during a search of the Eagle Haulers warehouse. Agent Laub testified that he connected a number of the invoices found at Eagle Haulers with unauthorized purchases made on multiple credit accounts. Trial Tr., Aug. 4, 2015, ECF No. 250, at 111:11–122:25. Agent Laub noted that the names and addresses on the invoices appeared to be phony, and did not match those of the account holders whose card numbers were used to make the purchase. Id. Agent Laub then linked these false identities with Taylor, describing how Taylor would use the same phony names and addresses in multiple transactions using different card numbers. Id. Some of these transactions involved goods that were later delivered to Fowler at Eagle Haulers. Id. Finally, Agent Laub testified that he observed a notice posted in the Eagle Haulers warehouse that described the company's standard moving and storage rates. Id. at 111:7–10. The rates Fowler charged to transport and store Taylor's goods were significantly higher than these posted rates. Id. at 114:3–16.

Most importantly, the government offered evidence that Fowler knew about the stolen credit card numbers. For example, Taylor testified that he asked Fowler to steal new credit card numbers from customers at Eagle Haulers, but that Fowler declined because he no longer accepted credit cards at his business. Trial Tr., Aug. 5, 2015, ECF No. 233, at 23:14–17. Taylor also testified that Fowler expressed concerns about the delivery drivers Taylor used to transport goods to Eagle Haulers, telling Taylor he worried they might be working with law enforcement. Id. at 22:18–23. In addition, Taylor recounted a conversation in which Fowler bragged about a "contact" he had with the police who could help get Fowler out of trouble. Id. at 23:18–22. Taylor later described a

7

specific instance in York, Pennsylvania when Fowler's "contact" helped him avoid arrest after the police began investigating a delivery Fowler made on Taylor's behalf. Id. at 23:18–24:13.

Even more significant is Taylor's testimony that he told Fowler directly that stolen credit cards were being used. During direct examination by the government, Taylor stated:

> Q. Did you ever at any point in your dealings with Mr. Fowler tell him that the stuff you were storing there was purchased with other people's credit cards?
>
> A. Yes.
>
> Q. Did he agree to let you store it there anyway?
>
> A. Yes.
>
> Q. Was this before or after your house was searched?
>
> A. Before and after.

Id. at 20:15–22. On cross examination, Taylor affirmed that Fowler knew he was using stolen credit card numbers:

> Q. In your debrief, the initial time that you sat down with the United States of America to work out a deal so that they could help you in exchange for cooperating with them, that August 11th meeting?
>
> A. Yes, sir.
>
> Q. You indicated that it was your opinion that these people should have known something was going on, but you had no idea if these people would know the true nature of the scheme, that it involved stolen credit card numbers?
>
> A. Fowler and Pemberton knew.
>
> Q. I'm asking what you said on August 11, not your opinion today.
>
> A. I said at the beginning they didn't know, but then they figured it out.

Trial Tr., Aug. 5, 2015, ECF No. 175, at 63:2–16.

Based on this testimony, there is plainly sufficient evidence for a reasonable juror to find Fowler guilty of the conspiracy alleged in Count 1. The evidence shows an organization of multiple parties across several states that would transport and sell household goods purchased with stolen credit card numbers. The evidence further shows that Fowler played an active role in this organization, delivering and storing items Taylor purchased with the stolen numbers. For example, testimony from Taylor and Sykes confirms that Fowler's storage business, Eagle Haulers, was the primary destination for goods without an immediate buyer. Taylor also noted that Fowler sometimes transported merchandise himself, and helped Taylor find buyers for the goods stored at Eagle Haulers.

Furthermore, there is both direct and circumstantial evidence that Fowler knew that Taylor was using stolen credit cards numbers. Taylor stated that he told Fowler that the goods were purchased with stolen numbers, and even asked Fowler if he could steal new credit card numbers from Fowler's customers. Taylor also testified about Fowler's "contact" with the police that helped him avoid arrest, and described how Fowler began charging higher prices when he became concerned about the "risk" involved in storing Taylor's goods. Agent Laub elaborated on the suspicious pricing scheme at Eagle Haulers, noting that the rates Fowler charged to handle Taylor's deliveries were higher than the standard rates posted in the Eagle Haulers warehouse.

To escape this evidence, Fowler asks the court to ignore testimony he deems unreliable—especially the testimony of Taylor—because it was "self-serving and selective" and "less-than-credible." See Fowler Mot., ECF No. 215, at 2. However, credibility determinations are for the trier of fact, not for the court. United States v. Johnson, 55 F.3d 976, 979 (4th Cir. 1995); see also United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994) ("The jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe."). At

9

this stage, the court must "construe the evidence in the light most favorable to the government" and "assum[e] its credibility." Johnson, 55 F.3d at 979 (citing United States v. Giunta, 925 F.2d 758, 764 (4th Cir. 1991)). Under this standard, the court concludes that a reasonable juror could find that Fowler knew of the credit card conspiracy alleged in Count 1 and knowingly and voluntarily became a part of it. Therefore, Fowler's motion as to Count 1 is **DENIED**.

### 2. Evidence of Pemberton's Role in the Conspiracy

Pemberton's challenge to Count 1 adopts the same arguments raised by Fowler. Pemberton claims there is no evidence that he knew of the alleged conspiracy or that he knowingly became a part of any unlawful agreement to commit credit card fraud. Pemberton also asks the court to discount Taylor's testimony, arguing that his own credibility is "far greater" than a "career criminal" like Taylor. Pemberton Mot., ECF No. 217, at 4–5.

For its part, the government notes that Pemberton signed a Statement of Facts confessing to his role in the conspiracy, including that he knew Taylor was using stolen credit cards. This statement was corroborated by witness testimony connecting Pemberton with multiple fraudulent transactions made by Taylor, including one instance in which Pemberton allegedly fled a store after employees began questioning him about a purchase. The government argues that this evidence is sufficient for a reasonable juror to find Pemberton guilty on Count 1. The court again agrees.

As with Fowler, much of the government's evidence against Pemberton comes from Taylor's testimony. Taylor stated that he hired Pemberton via the internet to work as one of his drivers, delivering goods Taylor purchased using the stolen credit card numbers. Trial Tr., Aug. 5, 2015, ECF No. 233, at 14:16–24. Pemberton was hired sometime after Sykes was arrested by officers investigating the ongoing fraud. Id. Pemberton owned his own truck, and was paid an average of $500.00 to $800.00 for each pick-up he made for Taylor. Id. at 16:5–7. Taylor testified that Pemberton made "well over ten" deliveries between 2013 and 2014. Id. at 16:8–12. In

10

addition, Pemberton introduced Taylor to Ayanou, who Pemberton described as a potential buyer for Taylor's goods. Id. at 16:13–19:16.

Taylor also detailed how he would coordinate pickups with Pemberton and his other drivers. Taylor typically used false names when he communicated with the drivers—for example, Taylor introduced himself as "Frances Young" when he first contacted Pemberton. Id. at 69:21–70:4. Taylor testified that he would typically call the driver to tell them which store was holding the merchandise, and then provide instructions on where the goods should be delivered. Trial Tr., Aug. 5, 2015, ECF No. 175, at 40:19–41:7. As stated above, Taylor also used false names and addresses when he purchased the merchandise, which were often included on the invoices the driver would receive from store employees during the pickup. Id. at 41:17–46:15. The false name on any specific invoice did not always match the false name Taylor used to communicate with the driver doing that particular delivery, nor did it match the eventual buyer to whom the driver delivered the goods. Id.

The government supplemented Taylor's testimony with that of Sykes, who made multiple pickups for Taylor before he was arrested and replaced by Pemberton. Sykes testified that, during a typical pick-up, the driver would enter a store and inform a store employee that he was there to pick up a delivery. Trial Tr., Aug. 5, 2015, ECF No. 234, at 8:16–9:4. The delivery would be under whatever false name Taylor used when he purchased the goods, which Taylor would provide to the driver prior to the pickup. Id. The driver would then collect the merchandise and an invoice from the store—the invoice included the name and address of the "customer" who purchased the merchandise. Id. at 9:9–10:20.

As to Pemberton's knowledge of the conspiracy, the government offered several pieces of evidence to show that Pemberton knew Taylor was using stolen credit card numbers. For example, the government introduced a Statement of Facts outlining Pemberton's role in the conspiracy. See Gov't Ex. 30. This Statement of Facts was prepared by the government, signed by Pemberton and

11

his counsel, and filed with the court in anticipation of a possible guilty plea. Pemberton later gave notice that he no longer intended to plead guilty, and wished to proceed to trial. The Statement of Facts was nevertheless admitted in the government's case-in-chief. The Statement of Facts states that Pemberton agreed to pick up merchandise for Taylor from home improvement stores in 2013 and 2014 and knew that Taylor was purchasing this merchandise using credit card numbers stolen from other people. See Gov't Ex. 30, at 1.

Consistent with the Statement of Facts, Taylor testified that be believed Pemberton knew that he was using stolen card numbers. Taylor stated during cross examination:

> Q. You indicated that it was your opinion that these people should have known something was going on, but you had no idea if these people would know the true nature of the scheme, that it involved stolen credit card numbers?
>
> A. Fowler and Pemberton knew.
>
> Q. I'm asking what you said on August 11, not your opinion today.
>
> A. I said at the beginning they didn't know, but then they figured it out.

Trial Tr., Aug. 5, 2015, ECF No. 175, at 63:7–16. Taylor also described how at least two other drivers he used to pick up merchandise refused to work with him after two or three deliveries because they realized that Taylor was engaging in fraudulent activity. Id. at 62:9–63:1. Taylor then agreed that drivers like Pemberton would know about his scheme, noting that the drivers were the only individuals who transferred the merchandise between the store and the eventual buyer. Id. at 65:5–18.

Further testimony described one instance in which Pemberton allegedly fled a store after employees began questioning him about a purchase. Taylor testified that he told Pemberton to leave a store if store employees asked too many questions about a specific order. Trial Tr., Aug. 5, 2015, ECF No. 233, at 15:16–24. In his Statement of Facts, Pemberton acknowledged that he fled a

12

Home Depot in Gaithersburg, Maryland on March 23, 2014 after an employee told him she needed to confirm a $4,456.46 purchase of wood flooring. See Gov't Ex. 30, at 1. Pemberton also stated that the credit card used to make the purchase in Gaithersburg belonged to another person. Id.

The government then offered testimony from Cindy Baumgartner and William Adams, who were involved in the March 23 incident. Baumgartner was working at the Gaithersburg Home Depot when she was approached by an individual named "Steve" who needed help picking up an order. Trial Tr., Aug. 6, 2015, ECF No. 252, at 3:10–4:22. Baumgartner stated that she became suspicious after realizing that the customer address on the order was in Alexandria, Virginia and that "Steve" had thus bypassed multiple, closer Home Depot locations before arriving at the Gaithersburg store. Id. at 4:6–5:10. Baumgartner asked "Steve" if he could name the customer who ordered the flooring—the order confirmation identified the customer as "Francis Young." Id. at 5:24–6:3.[6] When "Steve" could not provide the name, Baumgartner tried to contact "Francis Young" at the phone number provided when the order was first processed. Id. at 6:4–24. After failing to reach Young several times, Baumgartner told "Steve" she need to speak with someone in the back and began walking to the rear of the store. Id. at 8:24–9:11.

Before Baumgartner could reach the rear of the store, she was told that "Steve" had left after telling other employees that he had spoken with Young and that Young would now being picking up the flooring. Id. Baumgartner returned to the front of the store, but could not locate "Steve" or the truck he was driving. Id. at 9:12–18. Baumgartner then reported her concerns about this transaction to Adams, who works as a retail crime investigator with Home Depot. Id. at 14:4–12; see also Trial Tr., Aug. 6, 2015, ECF. 251, at 6:25–9:25. Adams confirmed that the credit card transaction was fraudulent. Trial Tr., Aug. 6, 2015, ECF. 251, at 8:3–22.

---

[6] As stated above, the government offered evidence that Taylor frequently used the name "Francis Young" when he communicated with drivers and when he made purchases with the stolen credit card numbers.

13

When construed in the light most favorable to the prosecution, this evidence is sufficient for a reasonable juror to find Pemberton guilty on Count 1. As with Fowler, the government offered evidence that Pemberton played an active role in the credit card conspiracy directed by Taylor. Taylor and Sykes testified as to the workings of the conspiracy. Taylor testified that Pemberton coordinated directly with him to transport fraudulently purchased merchandise to locations across multiple states. Taylor also testified that Pemberton knew about the stolen credit card numbers. This testimony is buttressed with Pemberton's own Statement of Facts, which concedes that Pemberton knew that Taylor was using false identities to make fraudulent transactions on credit accounts belonging to other people.[7] Pemberton's knowledge of the fraud is further reinforced by circumstantial evidence from the March 23 incident at the Gaithersburg Home Depot, when Pemberton suddenly left after Baumgartner told him she would need to confirm the charge before he could leave with the merchandise.

To be sure, questions abound as to Taylor's credibility as a witness. There is also some evidence that Pemberton was unaware of the stolen credit card numbers. For example, Sykes— who, like Pemberton, was a driver for Taylor and thus had similar contacts with the alleged

---

[7] Pemberton argues that his signed Statement of Facts is the only credible evidence against him, and notes that a conviction cannot rest entirely on a defendant's own statement. This argument is misplaced. It is true that a conviction "cannot rest entirely on [a defendant's] uncorroborated extrajudicial confession." United States v. Stephens, 482 F.3d 669, 672 (4th Cir. 2007). However, Pemberton's Statement of Facts is not the only evidence linking him to criminal activity. Taylor and Sykes independently explained the nature of the alleged conspiracy, and Taylor outlined Pemberton's role in it. Taylor also testified that Pemberton knew about the stolen credit card numbers. Further testimony from Baumgartner and Adams described the March 23, 2014 incident at the Gaithersburg Home Depot. Thus, while the Statement of Facts is a key piece of evidence in this case, it is not the sole evidence against Pemberton on Count 1. Moreover, the government adequately corroborated Pemberton's statement, at least for purposes of the present motion. As the Fourth Circuit notes, corroborating evidence must "only tend to support the admitted fact" and "need not, itself, establish every element of the offense." Stephens, 482 F.3d at 672 (internal citations omitted). Put differently, "extrinsic proof [is] sufficient [if it] merely fortifies the truth of the confession, without independently establishing the crime charged." Id. (citing Wong Sun v. United States, 371 U.S. 471, 489–90 (1963) (internal quotation marks omitted)). In this case, the testimony of Taylor, Sykes, Baumgartner, and Adams mirror Pemberton's essential admissions in the Statement of Facts, and are sufficient to corroborate those admissions. See United States v. Waid, No. 7:09-CR-110-FL, 2010 WL 4484541, at *4 (E.D.N.C. Oct. 28, 2010) (finding that the testimony of a single witness can sufficiently corroborate a defendant's confession).

14

conspiracy—stated on cross examination that he did not realize Taylor was using stolen credit card numbers. Trial Tr., Aug. 5, 2015, ECF No. 174, at 14:5–23. Sykes then admitted that he "assumed" and was "pretty sure" that Taylor was committing credit card fraud only after he discovered another driver had been arrested delivering goods for Taylor. Id. at 18:7–19:3. However, the court cannot resolve issues of credibility at this stage, nor can it decide between conflicting interpretations of the evidence. See Murphy, 35 F.3d at 148. Those decisions are for the jury. The court can only decide if the government's evidence, construed in the light most favorable to the prosecution, can support a finding of guilt beyond a reasonable doubt on Count 1. The government's evidence against Pemberton satisfies this standard. Therefore, Pemberton's motion to dismiss Count 1 is **DENIED**.

## B. Counts 4 and 5

Counts 4 and 5 charge aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4), and 2.[8] The government concedes that there is no evidence that Fowler or Pemberton personally committed the crime of aggravated identity theft. Rather, it argues that the defendants are liable under the Pinkerton doctrine for any substantive crimes committed by their co-conspirators or, in the alternative, aided and abetted Taylor's commission of aggravated identity theft. For their part, defendants claim they cannot be liable as co-conspirators under the Pinkerton doctrine because the government offered no evidence that they were members of the conspiracy alleged in Count 1 and no evidence that Taylor's commission of aggravated identity theft was reasonably foreseeable to them. Likewise, defendants argue that the evidence cannot support aiding and abetting liability because the government offered no evidence that they knew Taylor was using

---

[8] The elements of aggravated identity theft in this case include: (1) that the defendant knowingly transferred, possessed, used, or aided and abetted the transfer, possession, or use of a means of identification; (2) that the defendant knew the means of identification belonged to another actual, specific person; (3) that the defendant transferred, possessed or used the means of identification without lawful authority or aided and abetted thereof; and (4) that the defendant transferred, possessed, or used the means of identification during and in relation to the conspiracy to commit credit card fraud charged in Count 1. See United States v. LaFaive, 618 F.3d 613, 615–18 (7th Cir. 2010); United States v. Gomez, 580 F.3d 1229, 1233 (11th Cir. 2009). In contrast to other types of identity fraud, aggravated identity theft requires proof that the defendant knew he was misappropriating the identifying information of a real person. See United States v. Lumbard, 706 F.3d 716, 722 (6th Cir. 2013) (citing Flores-Figueroa v. United States, 556 U.S. 646, 657 (2009)).

15

stolen credit card numbers or that they knowinglyaided Taylor in committing aggravated identity theft.

The court will only address Pinkerton liability, as it finds this issue dispositive. "The Pinkerton doctrine makes a person liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy." United States v. Ashley, 606 F.3d 135, 142–43 (4th Cir. 2010) (citing United States v. Singh, 518 F.3d 236, 253 (4th Cir.2008)). The Pinkerton doctrine is distinct from the crime of conspiracy, and "provides that a person can commit an offense not only by engaging in the forbidden conduct himself but also by participating in a conspiracy that leads a confederate to engage in that conduct." Id. Put differently, the Pinkerton doctrine imputes liability for any substantive offense committed in the course of a conspiracy to all members of that conspiracy, including co-conspirators who did not personally commit the substantive offense. See United States v. Ferguson, 245 F. App'x 233, 242 (4th Cir. 2007). For Pinkerton liability to apply, the government must prove: (1) that a member of the alleged conspiracy committed the substantive offense at issue; (2) that this offense was committed during the conspiracy and in furtherance of its goals; (3) that the defendant was a member of the conspiracy at the time the substantive offense was committed by the co-conspirator; and (4) that the commission of the substantive offense was reasonably foreseeable to that defendant. Id. (citing Pinkerton v. United States, 328 U.S. 640, 647–48 (1946)); see also United States v. Bingham, 653 F.3d 983, 997 (9th Cir. 2011); United States v. Carrington, 301 F.3d 204, 211–12(4th Cir. 2002).

There is no dispute that the government offered sufficient evidence on the first three elements of Pinkerton liability. Renodo Taylor was a member of the conspiracy alleged in Count 1, and he admitted to many acts of aggravated identity theft during the course of his association with Pemberton and Fowler. Taylor's admission was supported with testimony from multiple other

16

witnesses and the records of various credit accounts that detailed Taylor's use of stolen credit card numbers. Moreover, the court has already concluded that there is sufficient evidence for a rational juror to find that Fowler and Pemberton knowingly and voluntarily participated with Taylor in a conspiracy to commit credit card fraud. Therefore, the only remaining issue is whether the government offered sufficient evidence that Taylor's commission of aggravated identity theft was reasonably foreseeable to Fowler and Pemberton. The court concludes that it did.

As stated above, the purpose of the conspiracy alleged in Count 1 was to make fraudulent purchases of household goods. The government offered both direct and circumstantial evidence that Fowler and Pemberton knew that Taylor was using credit card numbers to purchase goods online or over the phone, and knew that the card numbers had been stolen from real people. For example, Taylor testified that he told Fowler directly that he was using stolen credit card numbers, and went so far as to ask Fowler if he could steal new numbers from Fowler's customers. There was also testimony about a number of invoices and receipts found at Fowler's business that were connected with unauthorized purchases made on real credit accounts. Many of these documents were introduced at trial, and witnesses tied these fraudulent invoices to the corresponding account holders whose credit card numbers were used to purchase the merchandise. Similarly, Taylor testified that Pemberton also knew that stolen credit card numbers were being used, which corroborates Pemberton's admission in his Statement of Facts that he knew Taylor was using false identities to make fraudulent transactions on credit accounts belonging to other people. Pemberton also acknowledged in his Statement of Facts that the card number used in the March 23, 2014 transaction at the Gaithersburg Home Depot belonged to a specific individual. Construing this evidence in the light most favorable to the government, the court finds that a reasonable juror could find, beyond a reasonable doubt, that Taylor's commission of aggravated identity theft was reasonably foreseeable to both Fowler and Pemberton. Therefore, there is sufficient evidence to

17

find defendants guilty of Counts 4 and 5 under the Pinkerton doctrine. The defendants' motions to dismiss these counts are thus **DENIED**.

## III.

The court must address one final point raised by Pemberton. In his written motion, Pemberton suggests that the court should conduct a two-part analysis of the defendants' motion for acquittal, first ruling based only on the evidence presented in the government's case-in-chief, then ruling based on all the evidence presented at trial. Pemberton notes in his motion: "[t]he Court is in the position of having to rule on the Motion for Judgment of Acquittal at the close of the government's evidence AND [sic] this Motion for Judgment of Acquittal at the close of all the evidence." Pemberton Mot., ECF No. 217, at 2. Pemberton then asks the court to consider his own trial testimony—which was offered after the government rested its case-in-chief—when ruling on his motion. Id.

As stated previously, the court reserved decision on the defendants' Rule 29 motions at the close of the government's case. Under a plain-text reading of Rule 29, the court must therefore base its ruling on the evidence as it existed when the government rested its case-in-chief. See Fed. R. Crim. P. 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."). As the Fourth Circuit explained, Rule 29(b) prevents a district court from "penalizing" a defendant by reserving decision on a defendant's motion at the close of the government's case, only to later deny that motion based on evidence offered by the defendant. United States v. Gray, 405 F.3d 227, 237 (4th Cir. 2005).

However, the issue raised by Pemberton is somewhat different. After the court reserved decision on defendants' Rule 29 motions at the close of the government's case, both defendants renewed their motions at the close of all the evidence. The court continued to reserve decision and submitted Counts 1, 4, and 5 to the jury. Thus, it is not clear if the current Rule 29 motions should

18

be treated as having been reserved at the close of the government's evidence or at the close of all the evidence. In the latter circumstance, Rule 29(b) allows the court to consider Pemberton's testimony. In the former, Rule 29(b) allows consideration only of the evidence submitted in the government's case-in-chief.

The court could find no controlling authority directly addressing this issue, and persuasive precedent is mixed. On similar facts, some courts confine their analysis to the evidence presented in the government's case-in-chief, see, e.g., United States v. Hollnagel, 955 F. Supp. 2d 830, 835–36 (N.D. Ill. 2013); United States v. Bonner, 735 F. Supp. 2d 405, 406 (M.D.N.C. 2010), aff'd, 648 F.3d 209 (4th Cir. 2011), while others consider the entire record. See e.g., United States v. Bonventre, No. 10-CR-228-LTS, 2014 WL 3673550, at *2 (S.D.N.Y. July 24, 2014); United States v. Kalahar, No. 06-20514-BC, 2007 WL 1500536, at *6 (E.D. Mich. May 23, 2007). As a practical matter, the court sees no reason why it should ignore Pemberton's testimony if Pemberton believes it supports his motion for acquittal. It would be strange indeed if Rule 29(b)—a rule intended to protect defendants—was applied to penalize a defendant whose argument for acquittal depends on evidence presented after the court took his Rule 29 motion under advisement. Moreover, the underlying purpose of Rule 29 seems best served when a court can consider whatever trial evidence the defendant deems relevant to his argument for acquittal.

Nevertheless, the court need not resolve this issue in order to rule on the motions before it. Even if the court were to consider evidence presented after the government rested its case-in-chief, it would still deny the defendants' Rule 29 motions. Pemberton was the only defendant to testify, and his testimony was supplemented with only three defense exhibits. After careful review, the court finds nothing in this evidence that supports a judgment of acquittal on any count. Pemberton forcefully claimed to have no knowledge of stolen credit cards, and offered a variety of explanations for his role in the alleged conspiracy and the suspicious behavior observed by the government's

19

witnesses. However, the jury, not the court, must weigh Pemberton's credibility and resolve any conflicts in the evidence created by his statements. See, e.g., Bonner, 735 F. Supp. 2d at 407. His testimony thus has no impact on the ultimate question presented here; namely, whether the government's evidence was sufficient for a reasonable juror to find defendants guilty beyond a reasonable doubt on Counts 1, 4, and 5. Therefore, to the extent Pemberton's testimony can be considered at this stage, it does not affect the court's prior analysis of the evidence.

## IV.

For the reasons set forth above, the court will **DENY** defendants motions for acquittal, ECF Nos. 215, 217.

An appropriate Order will be entered.

Entered: 02-09-16

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge