# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 5:14-cr-00058 |
| | ) | |
| v. | ) | By:   Michael F. Urbanski |
| | ) | United States District Judge |
| RICHARD SHELTON FOWLER, et al., | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OPINION

Before the court are defendant Steven Maurice Pemberton's Motion for Acquittal (ECF No. 382) and defendant Richard Shelton Fowler's Motion for Acquittal or, in the Alternative, Motion for a New Trial (ECF Nos. 347, 393). Pemberton asks the court to set aside the jury verdict and enter a judgment of acquittal on the charges of conspiracy to commit credit card fraud (Count 1) and credit card fraud (Count 9). Fowler asks the court to acquit him of conspiracy to commit credit card fraud (Count 1), credit card fraud (Count 7), and receipt of stolen goods (Count 13). For the reasons that follow, defendants' motions are **DENIED**.

### I.

On July 21, 2015, Pemberton, Fowler, and three other defendants—Leondra Sykes, Alexander Ayanou, and David Yarborough—were charged in a six-count superseding indictment arising from the alleged use of stolen credit card numbers to make fraudulent purchases of household goods.

Pemberton, Fowler, and Ayanou proceeded to trial on August 3, 2015. At the close of the government's evidence, defendants moved for a judgment of acquittal on all charges. ECF No. 187. The court granted the defendants' motions in part and reserved decision in part. ECF No. 190. The defendants renewed their Rule 29 motions at the close of trial. Id. The court continued to reserve decision, and submitted the remaining counts to the jury. Id. The jury returned a verdict finding Fowler guilty on all remaining counts, but could not reach a verdict as to Pemberton on any count. Ayanou was acquitted on all counts. After the jury returned its verdict, counsel for Fowler requested a poll of the individual jurors pursuant to Federal Rule of Criminal Procedure 31(d). The poll revealed a lack of unanimity as to the jury's verdict, and the court declared a mistrial as to Pemberton and Fowler. ECF No. 208.[1] Pemberton and Fowler then submitted written briefs in support of their motions for acquittal, and the court heard oral argument.

On February 10, 2016, the court denied their motions for acquittal. ECF Nos. 279, 280. Meanwhile, the government filed a second superseding indictment. ECF No. 258. It charged Pemberton with conspiracy to engage in credit card fraud, in violation of 18 U.S.C. §§ 1029(a)(2) and 1029(c)(1)(A)(i) (Count 1); credit card fraud, in violation of 18 U.S.C. §§ 1029(a)(5), 1029(c)(1)(A)(ii), and 2 (Count 9); and wire fraud, in violation of 18 U.S.C. § 1343 (Counts 10, 11, and 12). Id. Fowler was charged with conspiracy to engage in credit card fraud (Count 1), credit card fraud (Counts 7, 8, and 9), wire fraud (Counts 10, 11, and 12), and receipt of stolen goods, in violation of 18 U.S.C. §§ 2315 and 2 (Count 13).[2] Id.

---

[1] The court granted Alexander Ayanou's oral motion for a judgment of acquittal. ECF No. 206.

[2] The indictment originally brought additional counts of credit card fraud and aggravated identity theft against Pemberton and Fowler. However, the government later moved to dismiss these counts, ECF No. 261, and the court granted the motion. ECF No. 294.

2

Fowler and Pemberton were retried in August 2016. See ECF Nos. 341, 344, 348, 350. During the trial Pemberton and Fowler brought oral motions for acquittal, ECF No. 347, which the court took under advisement as to Count 13, granted as to Counts 8 and 11, and denied as to the remaining counts.[3] ECF No. 350. The jury returned a verdict on August 26, 2016, finding Pemberton guilty of Counts 1 and 9, and not guilty of Count 12. ECF No. 360. The jury found Fowler guilty of Counts 1, 7, and 13, and not guilty of Counts 9, 10, and 12. Id. Pemberton and Fowler subsequently brought motions for acquittal (and, in Fowler's case, for a new trial). The government filed its response on October 21. ECF No. 399.

## II.

Rule 29 of the Federal Rules of Criminal Procedure states that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). Based on this motion, the court may set aside a guilty verdict, or, "[i]f the jury has failed to return a verdict, the court may enter a judgment of acquittal." Id. at 29(c)(2).

"A judgment of acquittal based on the insufficiency of evidence is a ruling by the court that as a matter of law the government's evidence is insufficient 'to establish factual guilt' on the charges in the indictment." United States v. Alvarez, 351 F.3d 126, 129 (4th Cir. 2003) (quoting Smalis v. Pennsylvania, 476 U.S. 140, 144 (1986)). "The test for deciding a motion for a judgment of acquittal is whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." United States v.

---

[3] Thus, the oral motion for acquittal brought by both parties (ECF No. 347) is resolved except as to Fowler's challenge to his Count 13 conviction.

3

MacCloskey, 682 F.2d 468, 473 (4th Cir. 1982). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996).

Accordingly, a court must deny a defendant's motion if the evidence presented at trial, viewed in the light most favorable to the government, is sufficient for a rational juror to find each element of the offense beyond a reasonable doubt. United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1402 (4th Cir. 1993) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also United States v. Friske, 640 F.3d 1288, 1290–91 (11th Cir. 2011) ("In reviewing a sufficiency of the evidence challenge, we consider the evidence in the light most favorable to the [g]overnment, drawing all reasonable inferences and credibility choices in the [g]overnment's favor."). Defendants have a heavy burden: The court must refrain from credibility determinations, United States v. Arrington, 719 F.2d 701, 704 (4th Cir. 1983), and "[t]he uncorroborated testimony of one witness may be sufficient to sustain a verdict of guilty," Iid. at 705 (citing United States v. Shipp, 409 F.2d 33, 36 (4th Cir. 1969)).

Federal Rule of Criminal Procedure 33(a), meanwhile, permits the court "to vacate any judgment and grant a new trial if the interest of justice so requires." The court has broad discretion in ruling on Rule 33 motions. The Fourth Circuit has cautioned that a district court "'should exercise its discretion to grant a new trial "sparingly,"' and that it should do so 'only when the evidence weights heavily against the verdict.'" United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003) (quoting United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1989)) (citing United States v. Wilson, 118 F.3d 228, 237 (4th Cir. 1997)).

4

## III.

Pemberton first argues that there is insufficient evidence to convict him of Counts 1 and 9. He points to the government's "two primary areas of evidence": the testimony of Renodo Taylor ("Taylor") and call logs showing a number of calls between Taylor and Pemberton. ECF No. 382, at 2. He argues this evidence fails to establish his knowledge of the criminal enterprise, because it demonstrates no awareness "on or before this March 15, 2014 pickup and delivery" for which Pemberton was charged under Count 9. Id. at 4. This same failure taints Pemberton's Count 1 conviction: the government's lack of evidence as to when conversations occurred and what was said means that no reasonable jury could conclude that Pemberton knowingly and voluntarily entered into a conspiracy to commit credit card fraud. Id. at 6–9. Pemberton challenges his Count 1 conviction on venue grounds as well, arguing that the government's evidence only demonstrates acts taken by Pemberton in Maryland, "other than after August 11, 2014; the date [o]n which Mr. Taylor began cooperating with the government." Id. at 6.

Fowler also challenges his convictions for lack of sufficient evidence, arguing that "there was no evidence that [he] knew anything about (a) the unlawful agreement, (b) the fraudulent use of credit cards by Taylor, (c) the unlawful use of wires by Taylor, or (d) that the property involved was stolen property." ECF No. 393, at 3. Fowler also argues that venue was improper as to Count 13. Under Count 13, Fowler was charged with receiving stolen property in Maryland that was obtained in Virginia. To violate the statute, the property must have "crossed a State or United States boundary after being stolen." 18 U.S.C. § 2315. Fowler argues that, "by grounding the offense in geographic and temporal terms, the

5

legislature has established the venue where the crime must be prosecuted—in this case, in the District of Maryland." ECF No. 393, at 5. The court will address the defendants' arguments as to each count in turn.

## A. Count 1

Count 1 alleges a conspiracy in which individuals used stolen credit card numbers to purchase household goods from various home improvement stores. One defendant—David Yarborough—illegally obtained a series of credit card numbers from victims in and around Washington, D.C., which he then sold to Renodo Taylor. Taylor used the stolen numbers to purchase merchandise online or via phone from stores in Pennsylvania, Maryland, Virginia, North Carolina, and West Virginia.[4] Taylor allegedly contracted with various individuals— including Pemberton and Fowler—to deliver this merchandise to buyers Taylor identified. Occasionally, goods would be stored at Eagle Haulers, a Maryland storage facility owned by Fowler, before being delivered to one of Taylor's customers.

To meet its burden on Count 1, the government must prove: (1) that an agreement existed between two or more criminally culpable persons to commit credit card fraud; (2) that the defendants knew of the unlawful agreement; (3) that the defendants knowingly and voluntarily became a part of the unlawful agreement; (4) that at least one overt act was taken in furtherance of the unlawful agreement; and (5) that the unlawful agreement affected interstate commerce. See 18 U.S.C. § 1029. As with any conspiracy, the government need not offer direct evidence of an agreement to commit credit card fraud. "By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of

---

[4] Taylor pled guilty to multiple charges in a related case, including conspiracy and several counts of aggravated identity theft. See United States v. Taylor, No. 5:14-cr-057 (W.D. Va. Aug. 8, 2016) (amended judgment).

6

such an agreement." United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996). "Hence, a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced." Id. "Circumstantial evidence tending to prove a conspiracy may consist of a defendant's 'relationship with other members of the conspiracy, the length of this association, the defendant's attitude and conduct, and the nature of the conspiracy.'" United States v. Yearwood, 518 F.3d 220, 226 (4th Cir. 2008) (citing Burgos, 94 F.3d at 858). Moreover, "a member of a conspiracy may not know its full scope or partake in its full range of activities." United States v. Leonard, 777 F. Supp. 2d 1025, 1033 (W.D. Va. 2011). Thus, "the evidence need only establish a slight connection between a defendant and the conspiracy to support conviction." United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010).

### 1. Evidence of Pemberton's Role in the Conspiracy

Pemberton primarily attacks the second and third elements of conspiracy, arguing that there is insufficient evidence to demonstrate that he knew about the stolen credit card numbers, or that he voluntarily and knowingly joined the conspiracy. The government responds that Taylor testified to Pemberton's knowledge of the conspiracy. ECF No. 399, at 8–9. Moreover, circumstantial evidence also indicates Pemberton's knowledge, including Pemberton's abandonment of deliveries in the face of suspicion and the high prices he charged to transport Taylor's goods. Id. at 8. "[M]ost compelling," the government argues, is the fact that a fraudulent charge was apparent on the paperwork handled by Pemberton on March 15, 2014. Id. at 9. The government contends that this evidence, when viewed in the

7

light most favorable to the prosecution, is sufficient for a reasonable juror to convict Pemberton on Count 1. The court agrees.

Much of the evidence against Pemberton comes from the trial testimony of Renodo Taylor. Taylor testified that he found Pemberton on the internet and hired him to pick up and drop off goods. Trial Tr., ECF No. 376, at 12:21–13:1.[5] Taylor would call or text Pemberton to tell him delivery details. Pemberton would make the delivery, after which Taylor paid him a fee of between $400 and $1000. Id. at 14:1–15:8. Taylor never gave Pemberton his real name. Id. at 32:5. He did, however, instruct Pemberton on what to do if store employees became suspicious and "call[ed] the cops or something":

> A: I told him if they act funny or anything, feel any type of way about them, just to leave it.
>
> Q: Why did you have that discussion with him, to just leave it?
>
> A: So he can be aware of that [sic] they might be calling the cops or something.
>
> Q: Why would they be calling the cops?
>
> A: Because of the fraudulent purchase.
>
> Q: Did you have that discussion with Mr. Pemberton?
>
> A: Yes, sir.

Id. at 31:2–11.

Pemberton ran into store suspicion "on a few occasions." Id. at 31:23. For example, in March of 2014, there was an "incident" at a Home Depot in Gaithersburg, Maryland.

---

[5] Taylor's testimony is the only official trial transcript on the record, and thus the only portion of the trial to which this opinion specifically cites.

Case 5:14-cr-00058-MFU Document 408 Filed 12/14/16 Page 8 of 26 Pageid#: 6450

Pemberton went to pick up goods purchased by Taylor, but employees became suspicious. Id. at 30:7–18. Pursuant to Taylor's instructions, Pemberton left the store, and did not pick up the goods that day. Id. at 30:19–22. In another incident, Pemberton was loading goods into his truck, only to have Lowe's employees run out to the truck and abruptly unload it. Id. at 32:1–2. Despite these events, Pemberton continued to make deliveries for Taylor. Id. at 43:16–19.[6]

Moreover, during Taylor's testimony, the government played an audio clip of a phone call between Pemberton and Taylor. In that call, Pemberton tells Taylor, "I'm supposed to get these numbers today," referring to credit card numbers. Id. at 37:13. Later, Taylor tells Pemberton that he plans to use money he has received to purchase more credit card numbers. Id. at 42:17–19.

Taylor's testimony alone would allow a reasonable jury to conclude that Pemberton knowingly joined this conspiracy. That testimony is only bolstered by other evidence put forward at trial. United States Secret Service Agent Chad Laub ("Agent Laub") testified to the approximately nine recorded phone calls made to Pemberton pursuant to Taylor's cooperation with the government. During these phone calls, Taylor discussed his plans to acquire new credit card numbers, necessitating additional deliveries by Pemberton. Likewise, Agent Lee Micah Bridges, a United States Department of State diplomatic security officer, testified to a series of phone calls between Fowler, Pemberton, and Taylor preceding a March 15, 2014 fraudulent purchase at a Lowe's in Charlottesville, Virginia. These calls were

---

[6] Pemberton's reaction stands in contrast to several other drivers, of whom Taylor recalls, "[A]fter they figured out what was going on, they didn't want to deal with me anymore." Id. at 88:13–15.

9

only a small subset of the approximately 635 calls exchanged by Taylor and Pemberton during the course of this conspiracy.

Cindy Baumgartner ("Baumgartner"), a Gaithersburg, Maryland Home Depot employee, testified that she met Pemberton on March 23, 2014, when he came to Home Depot to pick up an order in the name of "Francis Young." Baumgartner, suspicious that the transaction was fraudulent,[7] told Pemberton that she would have to speak to colleagues at the service desk. Instead of waiting as instructed, Pemberton followed her to the service desk, then abruptly left when Baumgartner went to a back room to speak to Home Depot's loss prevention officer.

To be sure, the evidence is not entirely one-sided. There are ample reasons to doubt Taylor's credibility,[8] and there is no evidence that Pemberton was explicitly informed of the criminal nature of these transactions. However, it is not the court's role to resolve credibility issues at this stage, nor can it decide between conflicting interpretations of the evidence. See United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994) ("The jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe."). The jury was entitled to credit Taylor's testimony, and, viewing the record in the light most favorable to the prosecution, the jury's conclusion that Pemberton was aware of and knowingly chose to join the conspiracy is clearly reasonable. It is not the court's role, at this stage, to upset that reasonable conclusion.

---

[7] Baumgartner became suspicious when she realized that the customer address on the order was in Alexandria, Virginia, and that Pemberton had bypassed multiple, closer Home Depot locations before arriving at the Gaithersburg store.

[8] For one, Taylor's cooperation with the government, and the concomitant hope of a reduced sentence, gives him an incentive to implicate Pemberton.

Case 5:14-cr-00058-MFU   Document 408   Filed 12/14/16   Page 10 of 26   Pageid#: 6452

## 2. Pemberton's Venue Argument

Pemberton argues venue in the Western District of Virginia is improper because "[t]he only evidence presented by the [g]overnment in this trial" that shows an agreement to enter the conspiracy "was the March 23, 2014 incident in Gaithersburg, MD." ECF No. 382, at 5. The government responds that, in failing to raise this issue until now, Pemberton waived his venue challenge. ECF No. 399, at 11. Moreover, "the record is replete with acts committed in the Western District of Virginia and stores defrauded in this District." Id. The court agrees: the record demonstrates that venue in the Western District is proper.[9]

It is a "settled principle that venue on a conspiracy charge may be laid 'in any district in which a conspirator performs an overt act in furtherance of the conspiracy or performs acts that effectuate the object of the conspiracy.'" United States v. Smallwood, 293 F. Supp. 2d 631, 637 (E.D. Va. 2003) (quoting United States v. Mitchell, 70 F. App'x 707, 711 (4th Cir. 2003)). "Proof of acts by one co-conspirator can be attributed to all members of the conspiracy." United States v. Al-Talib, 55 F.3d 923, 928 (4th Cir. 1995). Moreover, "[a]cts in furtherance of a criminal conspiracy include exploits large and small, dealings that represent turning points in the conspiracy and those that merely enable it to continue its operations." United States v. Smith, 452 F.3d 323, 335 (4th Cir. 2006).

The record overflows with overt acts, committed by Pemberton and others, in the Western District of Virginia. The court need only point to one of the many fraudulent purchases undertaken by the defendants. Agent Bridges testified, in March of 2014, that Pemberton, Fowler, and Taylor engaged in a number of phone calls in preparation for a

---

[9] Accordingly, because the record is sufficient to establish proper venue as to Count 1, the court will not decide if Pemberton waived his venue challenge.

11

purchase from Lowe's in Charlottesville, Virginia (in the Western District of Virginia). Pursuant to these calls, Pemberton went to Lowe's, loaded the merchandise (a generator), and drove it to Fowler's warehouse in Maryland. All of this was testified to at trial and, though not uncontroverted, the jury was entitled to credit this testimony. These acts alone (leaving aside voluminous testimony of other acts within the Western District) compel the court to dismiss Pemberton's venue argument.

Because the court must reject both of Pemberton's arguments for acquittal, Pemberton's motion as to Count 1 is **DENIED**.

### 3. Evidence of Fowler's Role in the Conspiracy

Like Pemberton, Fowler primarily argues that the government has failed to demonstrate he knew about and voluntarily joined the conspiracy. Fowler points out that Taylor never told Fowler about the full extent of the criminal enterprise, and appears to have merely assumed that Fowler was aware. ECF No. 393, at 4. For its part, the government responds that circumstantial evidence amply demonstrates Fowler's knowledge. Moreover, Fowler's behavior is consistent with a desire to minimize his exposure to criminal liability: Fowler lied to police and created fake contracts and paperwork in order to avoid detection. ECF No. 399, at 12–13. The court again agrees.

As with Pemberton, the government primarily relies on Taylor's testimony to show Fowler's participation in the conspiracy. Taylor found Fowler and his moving company, Eagle Haulers, on the internet. Trial Tr., ECF No. 376, at 16:20–17:9. Taylor spoke to Fowler on the telephone (or occasionally in person) and asked him to make pickups and deliveries, for which Taylor paid Fowler between $800 and $1000. Id. at 18:10–11, 19:1–2.

12

Fowler also sometimes stored goods for Taylor at the Eagle Haulers warehouse, id. at 18:14–15, and occasionally found buyers for Taylor, id. at 24:4–6.

Fowler, like Pemberton, eventually ran into trouble while filling Taylor's orders: he was arrested in Pennsylvania after delivering a generator to a police officer in Maryland, id. at 20:11–22, and police once came to his warehouse to retrieve some lawnmowers he had recently picked up.[10] Id. at 26:5–7. Fowler too, was unperturbed; he told Taylor "everything [is] going to be okay," and continued to make deliveries. Id. at 22:22, 25:21–23. He did, however, start charging Taylor more money to make deliveries. Id. at 28:9–15.

Though Taylor admits that Fowler was unaware of the criminal conspiracy at first, id. at 21:11–15, these events opened his eyes. Afterwards, Fowler was "leery" of meeting other drivers at the Eagle Haulers warehouse, and at first met drivers elsewhere, before concluding that that behavior might appear suspicious. Id. at 23:17–25 ("[I]f something happen[ed] right there in the parking lot where they [were] switching [trucks], they would be wondering why they didn't come right to the next block to the warehouse."). In fact, Fowler shared with Taylor fraudulent paperwork—fake contracts and invoices that he believed would protect him from prosecution. Id. at 23:1–3; 114:23–115:1. Moreover, Taylor even attempted to get more credit card numbers from Fowler, asking him if he had "any old credit card receipts." Fowler told Taylor he would look, but ultimately never gave him any. Id. at 26:23–27:3. In addition, Fowler saw the paperwork associated with the merchandise being purchased—he

---

[10] Taylor also testified that Fowler encountered trouble at a Home Depot, but he could not remember the date or location of this incident. Id. at 54:14–55:1. Taylor believes Fowler "knew about the whole scheme" after that incident: the Home Depot employees did not allow Fowler to pick up the merchandise, and "told him it was a fraudulent deal and sent him out of there." Id. at 60:9–12.

13

was in a position to note that the names and addresses on the cards kept changing, despite the fact that he filled all of these orders for one person. Id. at 117:19–22, 118:11–13.[11]

Other testimony at trial also affirms Fowler's knowledge of the conspiracy. When authorities searched Eagle Haulers, Fowler lied to them, claiming he only charged less than $300 dollars to store two generators, when, in a phone call just prior to the search, he quoted Taylor a total price of $1200 ($800 to ship the merchandise, $200 to store it, and $200 to sell it).[12] Moreover, the search uncovered a falsified invoice, purporting to show a total fee of $120 to pick up and store the generators. Fowler also claimed he spoke on the phone with "John McHomer"—a fictitious customer created by the authorities pursuant to Taylor's cooperation with the government.

As with Pemberton, although the evidence against Fowler was not entirely uncontroverted, a reasonable jury was entitled to conclude that Fowler knowledgeably chose to join this conspiracy. The government offered evidence that Fowler played an active role in the conspiracy. Pursuant to Taylor's direction, he picked up, stored, and even sold merchandise acquired with stolen credit card numbers. Fowler created false paperwork to hide his tracks, lied to police officers, and generally planned his behavior so as to best insulate himself from criminal liability. The government's evidence, construed in the light most favorable to the prosecution, supports a finding of guilt beyond a reasonable doubt on Count 1. Accordingly, Fowler's motion as to Count 1 is **DENIED**.

---

[11] As with Pemberton, Taylor never gave Fowler his real name; instead, Fowler referred to him as "Shorty." Id. at 124:23.

[12] This phone call, unlike calls to Pemberton, went unrecorded; Fowler has a Maryland phone number, and Maryland requires that both parties to a phone call consent to any recording. Virginia, on the other hand, only requires one party to consent. Agent Laub testified that he chose not to record calls to Fowler because, in the event Fowler was prosecuted in Maryland state court, the recordings would be inadmissible.

14

## B. Count 7

Fowler was convicted of credit card fraud under Count 7 for his role in an October 21, 2013 fraudulent purchase at Lumber Liquidators in Lynchburg, Virginia. See ECF No. 258. He argues that the government has failed to carry its burden to prove liability as an aider and abettor: the evidence does not establish "that he knew that the offense was being committed and that he intended that the offense take place." ECF No. 393, at 3 (internal quotation marks and emphasis omitted). The court disagrees.

Fowler's conviction under Count 7 can be sustained based on liability as a principal, an aider and abettor, or a co-conspirator. The court will only address aider and abettor liability, as it finds this issue dispositive. 18 U.S.C. § 2(a) provides, "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." See United States v. Akinkoye, 185 F.3d 192, 201 (4th Cir. 1999). To be convicted under this theory, "the government must show that the defendant knowingly associated himself with and participated in the criminal venture." United States v. Kingrea, 573 F.3d 186, 197 (4th Cir. 2009) (internal quotation marks omitted) (quoting United States v. Winstead, 708 F.2d 925, 927 (4th Cir. 1983)). "To prove the element of association, the government must show that the defendant shared in the principals' criminal intent." Id.

On October 21, 2013, an order was placed in the name of "Francis Young" for $7,564.05 worth of wood flooring at Lumber Liquidators in Lynchburg, Virginia. Leondra Sykes picked up the flooring and delivered it to Fowler's Eagle Haulers warehouse in Maryland. A search of Eagle Haulers uncovered an invoice and a delivery receipt on

15

company letterhead; the latter document was signed by Fowler. A separate Eagle Haulers receipt for storage shows the exact same amount of flooring as the Lumber Liquidators invoice. Finally, Taylor made three phone calls to a cell phone number associated with Eagle Haulers on the day of the delivery.

Moreover, this evidence must be viewed in conjunction with the evidence supporting Fowler's conviction under Count 1. Fowler was in a position to appreciate Taylor's culpable behavior: he knew Taylor made purchases under multiple names, and charged high prices for storage and delivery. Fowler demonstrated a pattern of behavior, including misleading police officers, creating fraudulent documentation, and a reticence to reveal the location of his warehouse, consistent with a desire to protect himself from criminal liability. Moreover, Taylor testified that Fowler was unconcerned with police confrontations based on his interactions with Taylor, culminating with Fowler's arrest in Pennsylvania, believing that the paper trail he created would insulate him.

In short, the trial evidence, viewed in the light most favorable to the prosecution, is sufficient to allow a reasonable jury to conclude that Fowler, knowingly and with intent, aided and abetted Taylor's October 2013 credit card fraud. Fowler's motion as to Count 7 is **DENIED**.

### C. Count 9

Pemberton's conviction for credit card fraud under Count 9 stems from the March 15–16, 2014 fraudulent purchase at Lowe's in Charlottesville, Virginia.[13] Pemberton argues that "there is no evidence that provides a reasonable [t]rier of fact [the information necessary

---

[13] Taylor purchased merchandise from Lowe's on March 15; it wasn't picked up by Pemberton until the 16th.

to conclude] that Mr. Pemberton was aware of any fraudulent use of credit cards on or before this March 15, 2014 pickup and delivery." ECF No. 382, at 4. Pemberton hinges this argument on the purported lack of specific evidence showing his knowledge "before the March 23, 2014 incident." Id. The court disagrees.

The evidence at trial showed that Taylor used a stolen credit card number to make a fraudulent purchase at the Charlottesville Lowe's in the amount of $4,832.22. This purchase was preceded by hundreds of calls between Pemberton and Taylor in the months leading up to this purchase[14]; moreover, on March 16, the day of the pickup, numerous calls were made among Fowler, Pemberton and Taylor. The government also introduced still images showing Pemberton at Lowe's, loading the generator into his vehicle.

Moreover, as with Fowler, these events must be examined in context. The evidence at trial showed a pattern of fraudulent purchases, frequently using the same false names paired with different credit card numbers and addresses. Pemberton was often privy to the paperwork that evidenced these falsehoods. As Pemberton points out, Taylor acknowledged that Pemberton was unaware of the criminal scheme at the beginning; Taylor also never directly used the term "fraudulent credit card numbers." However, it does not follow that it was unreasonable for the jury to conclude that Pemberton was aware of the fraudulent scheme by the time he made the pickup on March 16. On the contrary, the jury reasonably interpreted the circumstantial evidence as showing beyond a reasonable doubt that

---

[14] Pemberton argues that "[t]he phone log sheets have no bearing on this issue because Mr. Taylor has repeatedly asserted that he did not tell Mr. Pemberton anything when he first started dealing with him." Id. at 5. While the phone log sheets do not provide direct evidence of Pemberton's knowledge, they certainly bear on the issue of accomplice liability. The jury was entitled to conclude that the numerous calls between Pemberton and Taylor, combined with Taylor's testimony and the wealth of circumstantial details indicated Pemberton's knowledge of his own culpability, demonstrate beyond a reasonable doubt that Pemberton was aware of, and intended to advance, Taylor's credit card fraud.

17

Pemberton did have such knowledge. Because sufficient evidence supports the jury's reasonable conclusion as to Pemberton's culpability, the court cannot set it aside. Accordingly, Pemberton's motion as to Count 9 is **DENIED**.

### D. Count 13

Fowler challenges his conviction under Count 13 for receipt of stolen property on both substantive and procedural grounds. Substantively, he argues that the government has failed to show that he knew the property was stolen. ECF No. 393, at 2. Procedurally, he argues that venue is improper in the Western District of Virginia: because the charging statute, 18 U.S.C. § 2315, only criminalizes receipt of stolen property "which ha[s] crossed a State or United States boundary after being stolen," Fowler's criminal conduct can only have occurred in Maryland once the property in question was taken across the Virginia state line. The court will address both arguments.

### 1. Evidence of Fowler's Receipt of Stolen Property

To prove a violation of 18 U.S.C. § 2315, the government must show (1) that the goods received were stolen; (2) that the goods had a value of at least $5000; (3) that the goods crossed a state or national boundary after being taken; and (4) that the defendant knew the goods were stolen. See United States v. Jones, 797 F.2d 184, 186 (4th Cir. 1986); United States v. Tashjian, 660 F.2d 829, 839 (1st Cir. 1981).

Fowler is charged under Count 13 for his receipt of property purchased by Taylor from Lumber Liquidators in Lynchburg, Virginia. As described supra, the evidence presented at trial shows that Taylor purchased 1353.14 square feet of wood flooring from Lumber Liquidators in October 2013. Taylor had Leondra Sykes pick up the flooring and

18

deliver it to Fowler's Eagle Haulers warehouse in Maryland. The jury reasonably concluded that the evidence at trial supported convicting Fowler for credit card fraud based on this fraudulent purchase. Given the jury's conclusion, and this court's decision to deny Fowler's Rule 29 motion as to Count 7, Fowler's conviction under Count 13 must stand. Elements 2 and 3 were established at trial: Invoices recovered during the search of Eagle Haulers showed that Sykes delivered the flooring to Fowler in Maryland, and that the flooring had a value exceeding $5,000. Elements 1 and 4, meanwhile, are in fact necessary to Fowler's conviction under Count 7. See 18 U.S.C. § 1029(a)(2) (criminalizing "knowingly and with intent to defraud . . . us[ing] one or more unauthorized access devices . . . and by such conduct obtain[ing] anything of value aggregating $1,000 or more"); supra pp. 15–16. Fowler's challenges to Count 7 and Count 13 both focus on the government's failure to prove his knowledge of the fraudulent transactions. In both cases, the court concludes that his argument is unfounded, as there was sufficient evidence to support the jury's decision.

## 2. Venue

The Constitution requires that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. This "protect[s] criminal defendants from the inconvenience and prejudice of prosecution in a far-flung district bearing no connection to their offenses." United States v. Smith, 452 F.3d 323, 334 (4th Cir. 2006). Accordingly, unless the criminal statute specifically provides for venue,[15] the court must look to "the nature of the crime alleged and the location of the act

---

[15] "Congress may constitutionally enact a statute for venue 'in any criminal court of the United States through which a process of wrongdoing moves.'" United States v. Melia, 741 F.2d 70, 71 (4th Cir. 1984) (per curiam) (quoting United States v. Johnson, 323 U.S. 273, 276 (1944)).

19

or acts constituting it." United States v. Cabrales, 524 U.S. 1, 5 (1998) (internal quotation marks omitted) (quoting United States v. Anderson, 328 U.S. 699, 703 (1946)).

"Despite its constitutional dimension, however, proper venue may be waived by the defendant." United States v. Ebersole, 411 F.3d 517, 525 (4th Cir. 2005). Accordingly, before proceeding to the merits, the court must determine if Fowler waived his improper venue argument by failing to raise it before trial. See United States v. Collins, 372 F.3d 629, 633 (4th Cir. 2004).

### a. Waiver

"Because proper venue is a constitutional right, waivers of venue rights through failure to object should not readily be inferred." United States v. Stewart, 256 F.3d 231, 238 (4th Cir. 2001). Thus, defendants may raise venue objections post-trial, unless "the asserted venue defect 'is apparent on the face of the indictment.'" Collins, 372 F.3d at 633 (quoting Melia, 741 F.2d at 71). If venue is properly alleged in the indictment, any venue defect is not apparent. United States v. Engle, 676 F.3d 405, 413 (4th Cir. 2012).

Count 13 charges, "On or about October 21, 2013, in the Western Judicial District of Virginia, and elsewhere," Fowler received "1353 square feet of Bellawood flooring fraudulently obtained from the Lumber Liquidators store in Lynchburg, Virginia and afterward transported to the State of Maryland." ECF No. 258, at 16–17 (emphasis added). The emphasized text properly alleges venue: that Fowler received stolen property in the Western District of Virginia. Fowler now argues that the evidence presented at trial fails to support the venue alleged in the indictment—an argument that could not have been raised before the trial began. Accordingly, the court concludes that Fowler has not waived his

venue challenge. See Engle, 676 F.3d at 416–17 (because the government alleged that the defendant committed the offense "in the Eastern District of Virginia and elsewhere," venue was properly alleged, and defendant did not waive venue challenge). Contra Ebersole, 411 F.3d at 528 (holding a venue challenge waived "[b]ecause every fact giving rise to [defendant's] present . . . objection to venue clearly appeared on the face of the indictment").

### b. Proper Venue

When acts constituting an offense take place in multiple venues, the defendant may be prosecuted in any one of those venues. This is true "notwithstanding the possibility that the gravamen of the wrongdoing took place elsewhere." Smith, 452 F.3d at 334. Congress provided for this possibility in the first paragraph of 18 U.S.C. § 3237(a): "[A]ny offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." The second paragraph of that statute, meanwhile, allows broader venue possibilities for "continuing offenses":

> Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

Id. § 3237(a), ¶ 2 (emphasis added).

The government, relying on United States v. Melia, 741 F.2d 70 (4th Cir. 1984), argues that a conviction under 18 U.S.C. § 2315 involves "transportation in interstate or foreign commerce," and thus represents a "continuing offense" for the purposes of 18

21

U.S.C. § 3237(a), ¶ 2. Thus, because the stolen flooring moved from the Western District of Virginia into the District of Maryland, venue in either district is proper. Fowler responds that Melia is no longer valid in light to subsequent amendments to 18 U.S.C. § 2315. Though Fowler raises an interesting argument, the court ultimately is persuaded to agree with the government.

18 U.S.C. § 2315 was amended in 1986.[16] Prior to this amendment, the statute criminalized receipt of goods "moving as, or which are a part of, or which constitute interstate or foreign commerce." Pub. L. No. 99-646, 100 Stat. § 3618 (Nov. 10, 1986). Melia, decided in 1984, relied on the pre-amendment version of § 2315, and held that "Section 3237(a) was enacted . . . to deal precisely with th[e] interstate process of wrongdoing" implicated by § 2315.[17] 741 F.2d at 72 (internal quotation marks omitted).

Post-amendment, however, § 2315 no longer exactly ties itself to interstate commerce. Instead, the statute now criminalizes receipt of property "which ha[s] crossed a

---

[16] This change was not made with any thought as to how venue under the statute would be affected. Instead, the change was made for two reasons. First, the amended language more closely matched a similar statute dealing with the receipt of stolen vehicles. See Sen. Rpt. No. 99-278. Second, Congress intended to "eliminat[e] the present requirement that the property still be considered as moving in interstate or foreign commerce at the time the defendant receives, conceals, or disposes of it." United States v. Trupin, 117 F.3d 678, 683 (2d Cir. 1997) (quoting H.R. Rep. No. 99-797 (1985)).

Defendants often challenged convictions under the prior version of § 2315 by arguing that, by the time they received the stolen property, it was no longer a part of interstate commerce. For example, in United States v. Licavoli, 604 F.2d 613 (9th Cir. 1979), the Ninth Circuit Court of Appeals held against a defendant making this argument, and found that the jury could determine that the stolen property was still in interstate commerce, despite the fact that it crossed state lines prior to being received by the defendant. Id. at 624. But see United States v. Strauss, 678 F.2d 886, 894 (11th Cir. 1982) ("A good that has come to rest in a state has lost its interstate character."). The new version of the statute eliminates this confusion, by specifying that the property need not still be involved in interstate commerce; so long as it at one point crossed state or national borders, § 2315 applies. See Trupin, 117 F.3d at 683 ("Although the 'moving as interstate commerce' requirement of the original statute was generally broadly construed, a number of courts intimated that, if an item once moving was found to have 'come to rest,' subsequent attempts to receive, conceal, sell, or dispose of the property would not violate the statute's prohibitions.").

[17] Moreover, as courts around the country note, the legislative history of § 2315 indicates that Congress intended to include the offense within the venue provisions of § 3237. E.g., United States v. Allen, No. 2011-027, 2012 WL 4506547, at *9 (D.V.I. Oct. 2, 2012) (collecting cases). This legislative history, however, dates from the period before Congress amended § 2315, which lessens its probative value.

22

State or United States boundary after being stolen."[18] Fowler argues that this change de-links § 2315 from the "continuing offense" definition in § 3237(a), ¶ 2. Unfortunately for him, the (admittedly scant) case law on this issue suggests that, even post-amendment, a violation of § 2315 should be considered a continuing offense under § 3237(a).

The Fourth Circuit has thrice cited <u>Melia</u> subsequent to § 2315 being amended. In <u>United States v. Rowell</u>, No. 90-5347, 1992 WL 11123 (4th Cir. Jan. 28, 1992) (unpublished), the court again faced the same issue, and concluded that "there is simply no substantial difference, either factually, or legally, between <u>Melia</u> and this case." <u>Id.</u> at *3. Though the court did not expressly refer to the 1986 amendment to § 2315, it appears to have implicitly determined that the amendment left <u>Melia</u>'s venue analysis unaffected.

In <u>United States v. Ebert</u>, 178 F.3d 1287 (4th Cir. May 3, 1999) (unpublished table decision), meanwhile, the Fourth Circuit opined that a Supreme Court case, <u>United States v. Cabrales</u>, 524 U.S. 1 (1998), required the court to reconsider <u>Melia</u>. In <u>Cabrales</u>, the Court considered a money laundering charge, where the defendant was charged based on transactions that entirely took place in Florida. The money, however, was generated in Missouri, where Cabrales was indicted. <u>Id.</u> at 5. The Court held that venue was improper in Missouri because the defendant was charged "with criminal activity 'after the fact' of an offense begun and completed by others" in Missouri. <u>Id.</u> at 7. Thus, Cabrales could only be charged in the venue where his criminal conduct occurred. This is superficially similar to

---

[18] The post-amendment version of the statute likely implicates different conduct. In rejecting a commerce clause challenge to the post-amendment version of § 2315, the Second Circuit Court of Appeals held that

> [t]he new law might reach some conduct that was beyond the scope of the old law, e.g., stolen goods that have come to rest in their destination state. Yet, it also might be construed to exclude some conduct that the old law covered, i.e., wholly intrastate movement of stolen goods that is nonetheless part of commerce.

<u>Trupin</u>, 117 F.3d at 684.

23

Fowler: he received goods in Maryland that were stolen by others in Virginia. However, the defendant in Cabrales was charged under a statute that contained no reference to interstate transportation. Fowler, on the other hand, was prosecuted under § 2315, which, even post-amendment, still requires some proof of interstate movement. Therefore, the court's discussion of Melia was mere dicta, and less compelling than Rowell's reaffirmation of Melia's validity. Moreover, Ebert, like Rowell, was unpublished, and is therefore not controlling on this court. See United States v. Adams, 39 F. App'x 36, 38 (4th Circuit 2002) ("Unpublished cases are not binding precedent in this circuit."). Thus, to the extent Ebert conflicts with the Fourth Circuit's decision in Melia, it must give way.

Finally, in United States v. Engle, 676 F.3d 405 (4th Cir. 2012), the court considered a different statute, and analogized to the holding in Melia.[19] See id. at 417 n.8. The Engle decision noted that the defendant in Melia "argued that the essential conduct element of the crime occurred in Connecticut, and that the circumstance element of interstate transportation was irrelevant." Id. Because § 3237(a) "was enacted . . . to deal precisely with this interstate process of wrongdoing," the court rejected the defendant's argument. Id. (ellipsis in original). While Engle's precedential value is limited because it only references Melia by analogy, it does reaffirm Melia's viability in the Fourth Circuit.

Fowler, meanwhile, cites a lengthy discussion in United States v. Morgan, 393 F.3d 192 (D.C. Cir. 2004). In that case, the court upheld a venue challenge in which the defendant received stolen federal property in one state, but was prosecuted in the state where the

---

[19] The statute the Engle court considered, sexual exploitation of a minor, 18 U.S.C. § 2251(a), requires that "defendant knew or had reason to know that the visual depiction will be transported in interstate commerce, or that the visual depiction has actually been transported in interstate commerce." 676 F.3d at 412. Like the pre-amendment version of § 2315, the language of § 2251(a) exactly tracks the § 3237(a), ¶ 2 definition of "continuing offense ("Any offense involving . . . transportation in interstate or foreign commerce").

Case 5:14-cr-00058-MFU Document 408 Filed 12/14/16 Page 24 of 26 Pageid#: 6466

property was stolen. The court held that venue was improper; the defendant's offense was not a "continuing offense" within the meaning of § 3237(a), because, though the property was transported across state lines, it was only received within one state.[20] Id. at 198. The court held that "an offense involves transportation in interstate commerce only when such transportation is an element of the offense." The Morgan decision, however, interpreted 18 U.S.C. § 641 (2000), which contains no interstate transportation requirement. Moreover, even if Morgan squarely supported Fowler's argument, it would be insufficient to overcome the Fourth Circuit precedent affirming Melia, which is controlling on this court.[21]

To be sure, Fowler's argument has some appeal, as the post-amendment version of § 2315, which requires that stolen property have crossed state or national lines at some point prior to being received, no longer exactly tracks the "interstate commerce" language that defines a "continuing offense" under § 3237(a). However, until the Fourth Circuit sees fit to revisit Melia, it remains binding precedent. Fowler received property that was stolen in the Western District of Virginia and transported into the District of Maryland. Under § 3237(a), venue is therefore proper in either district. Accordingly, Fowler's motion as to Count 13 is **DENIED**.

---

[20] The court also referenced an opinion interpreting the pre-amendment version of § 2315, and approved of its holding that a violation of § 2315 constitutes a continuing offense under § 3237(a), ¶2. See id. at 200–01 (citing United States v. DeKunchak, 467 F.2d 432 (2d Cir. 1972)).

[21] National case law on the issue is equally scant: the court found only three cases that squarely address whether violation of the post-amendment version of § 2315 is a continuing offense. All support the government's position. See Allen, 2012 WL 4506547, at *9; United States v. Geier, No. CR-08-023, 2008 WL 2338487, at *3 (D. Idaho June 4, 2008); United States v. Luk, No. 93-276-CR-T-24(A), 1994 WL 125221, at *2 (M.D. Fla. Feb. 11, 1994).

Case 5:14-cr-00058-MFU   Document 408   Filed 12/14/16   Page 25 of 26   Pageid#: 6467

## IV.

For the reasons set forth above, the court **DENIES** defendants' motions for acquittal (and, in Fowler's case, for a new trial). ECF Nos. 347, 382, 393. An appropriate Order will be entered.

Entered: 12/13/2016

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge